for this week does consist of myself, Judge Benavides, and Judge Owen. Judge Benavides was here yesterday. He's not able to be here today. However, as you know, we are recording the arguments, and so Judge Benavides will listen to the arguments and participate in our conferencing and otherwise fully participate in the decision of the case. Although he's not here to ask you some penetrating questions, we will try our best to ask the ones that he would have asked you. But nonetheless, he will be fully participating in the case. And so with that, I remind you of what I try most people is just to say, if you stay center of the lectern, the microphones will definitely pick up your argument well. We'll hear it and even occasionally people in the audience want to hear what you have to say, even though we don't want you to play to the audience. But if you keep your voice up, the tape will be, but particularly here where he will be listening to the tape, and we listen to the tape actually to help us in writing the opinions or going back over it. And so the system is good, but it works best. Sometimes, even yesterday, we have lawyers who are used to giving their jury arguments, and so they like to move around and kind of do that. So for our purposes, if you just kind of stay there and keep your voice up. The only other admonition is just you're familiar with the lighting system. When it's green, you've got a full run. When it's amber, it's maybe a good idea if there's another point you meant to hit, you might want to shift gears. When the red light's on, it does mean stop, but it's very important that we get the answers to our questions. So if we're asking you questions, by all means, please fully answer the questions that we ask. With that, we're prepared and ready, and so we call the first case, United States of America v. Beecham et al. Who's up first? Mr. Kressler? Yes. Good morning. May it please the Court, Seth Kressler for the appellant, William Tisdale. For our order of operations, Your Honors, we would like to proceed today. I would like to begin my argument addressing the restitution issues. Then I will turn to the guideline-specific sentencing issues, and if I do not have time to address our multifaceted sufficiency issues, I will leave those to Mr. Whalen and Mr. Perez. Maybe I'll get to return to it on rebuttal. With regard to restitution, there's a point that the government makes in their brief. Judge Solis averred to it at the second sentencing hearing, where they actually took up restitution, and that was where they repeatedly said that the evidence that was presented was something along the lines of, quote, the best evidence we have available. And it seems to me that's very telling, because that necessarily suggests that we are in the flawed paradigm that comes from economics, a theory of second-best. And the problem with second-best evidence is that it is inherently unreliable. That is very important in the restitution context, where we're taking property from one citizen and giving it to another through the collection mechanism of the federal government. Before I turn, Your Honors, to the issues of robbers and the implication of that case and these other appellate cases, it dawned on me as I was preparing for this argument that we cannot say necessarily that the current holders of the note, at least current as the time of the sentencing, they probably since have been transferred again, there is no way to say that the current holders of the note actually bought them from either the mortgage issuer or some secondary group. It may well be, Your Honors, that the current holder of the note refinanced for the current occupant of the house. You could have an equitable subrogation type interest. Let's say that new refinancer did a bad title search. They didn't find some outstanding judgment lien that was entered. This Court, in order to accept this idea that whatever evidence the initial mortgage price minus the payments minus the sale price is necessarily what has to obtain, you would have to say that somebody who refinanced and did a bad title search nevertheless is a victim of Mr. Tisdale or his co-conspirators. We would argue, Your Honor, that is inherently flawed and it's not acceptable under Huey or any of the restitution cases. Turning specifically a year ago when we wrote the brief, of course, Robert's cert petition was still pending at that time, but the three main appellate cases that sort of arch the jurisprudential landscape here, Chiaca from the Eighth Circuit, Young from the Ninth, and James from the Tenth, those are still the three appellate cases on the issue of secondary lenders. In Young, which, of course, the Court cited to in Frazier, not the part that was overruled by Roberts, of course, at pages 601 to 602, there's a lengthy paragraph about all of the different factors that might impinge on what affects the damages to a secondary holder. It might be a function of the interest rate. It might be a function of any number of other things. We would argue, Your Honors, that one of the issues that this Court is confronted with as a result of being the first case in the country to apply Roberts in the context of these secondary purchasers is to what extent is the analysis now no longer unidimensional? All these other cases look at the situation where holder one sells to holder two, sells to holder three. Maybe you back out what was paid on it, but that seems to assume that these notes are always held or sold for par. Well, of course, they're not sold for par. Asset debt prices fluctuate for any number of other reasons, especially—and this is the point I think Justice Sotomayor was getting at in her concurrence in Roberts. By the way, the name of this case is allegorical, right? I mean, Roberts. It's rather ironic. But is that in the mortgage context, the only reason we had HARP instead of relief programs is that if one house goes into foreclosure, every other house in the neighborhood falls by, like, 30 percent. There's any number of reasons that we would argue is too removed from the causal chain to tag Mr. Tisdale or people like that with the restitution under the evidence that was, again, the government's burden to produce. Judge Solis said in direct words, you know, I don't have the evidence. It's the secondary resale price that the government didn't bring it and you defendants didn't bring it. Well, of course, it's the government obligation to bring it. If we accept that they did not bring it, then necessarily the restitution award is bad. We would argue this is different in the situation which compelled reversal on the case of the co-defendant Frazier last month and, of course, that we preserved this issue down below. This was heavily litigated. There were numerous objections on the whole second hearing on restitution. The government went and called a new expert witness, the case agent. We would argue, Your Honors, that what this court should do is remand to the proper determinations that he is required to make, but we would submit in this case it would be appropriate to tell the government they don't get a second bite on the apple. This is all the evidence they induced, they brought to even the second restitution hearings where all these issues have been fleshed out that Judge Solis should make these determinations based on that which was presented in the first instance. Why would we want to cut the government totally off? I mean, assuming, you know, some measure of sea change, perhaps not all, brought by the Supreme Court. I mean, if we're remanded at all, I mean, if nothing but from efficiency purposes, why would we want to issue a mandate that is somewhat conditional? In other words, what's the . . . I mean, I know the value in terms of the relief of your client, but in this sort of landscape here with secondary . . . kind of the nature of what we're talking about. Most of the time we get these ephemeral. I mean, you know, you get the accountant saying somebody can get their fingers around the dollars and calculate it. This is a lot more abstract because we're talking about market conditions and that kind of thing, and I'm not sure how many cases are out there, but it's a little different. We frequently have problems with the calculation of losses, but as I said, usually, you know, getting the right accountants or whatever, you sort it out, the judge makes a decision. So, I guess what I'm asking is because the nature of the kind of restitution we're talking about is so different, why wouldn't the value be for . . . at best, we remand it for further proceedings in light of, you know, what the Supreme Court said. I mean, to your point, the government either has the evidence or they don't. So, would your client be prejudiced by doing that? I'd like to answer your question, Judge Stewart, in two parts. Let me address the second part of your question first, which is with regard to the calculation of damages, certainly every restitution case, this Hornbook law, that restitution is going to have to be proved with, you know, mathematical precision. We don't have to have an actual down-to-the-penny accounting. Nevertheless, we would argue the authority that I would submit to the court in support of my argument that they should remand based on the record as it was adduced to the hearing is the Eleventh Circuit's very recent opinion in this case of Singletary. The site is 649 F3D 1212. It was an opinion by Judge Joe Flatton, a unanimous opinion, where the Eleventh Circuit did exactly that which I urged earlier in my argument, which is remand it to the district judge for the appropriate factual determinations within his province to make. But the exact words, the government does not get a second bite at the apple. That's exactly a direct quote from this from the Eleventh Circuit. Because, Your Honors, it's very important in this paradigm where the government bears the burden. If we were here on a sufficiency case, let's say somebody had been convicted of conspiracy, and I was challenging sufficiency of the evidence, and if the government said, you know, we admit we didn't call this witness who would have testified about agreement, but they were on our witness list, they were in the hallway, we would have called them, we'd say, of course not. They didn't bring it into the four corners of the courtroom when it was their obligation to do. Well, that's true, but let me owe you that. But if we think about the nature of restitution, I mean, obviously, maybe not obviously, but restitution is designed to make somebody whole. There's a loss. You know, there's a replacement of something that was diminished. So, for the purpose of sentencing, not so much punitive, but to replace that which is lost, why should, as far as a policy matter, the opportunity to make somebody whole or as close to whole or whatever, there may be, sort of, go down the tubes merely because in the scheme of saying no. So, I guess my point is, and I haven't read the case, I get your point on it, but because we are talking about, quote, restitution, usually it's an impossibility that 100% is going to be replaced. But if there's some measure of it, isn't there kind of an underlying policy here in the sentencing equation to allow maximum opportunity for that to happen? If it doesn't happen, fine. I think my answer to your question, Judge Stewart, most directly would be the structure and the exact requirements of the MVRA. There is this 90-day window in which a judgment can be held open before it's officially concretized as the restitution judgment. I know in the Supreme Court in Dolan said maybe that could be extended under certain circumstances, but here, since it's been, I don't know, about two years or so since the sentencing, you have effectively created a mechanism whereby the government's failure to reduce the evidence they were legally required to reduce in the first instance has extended that 90 days to something like two and a half years. That would be the first answer to your question, Judge Stewart. The second would be that, again, while certainly we do want, the law does want to make victims whole. District courts have no inherent power to do that. They can only do that pursuant to the statutory authority of the MVRA. What is absolutely impermissible, this, of course, goes to Huey 1 and Huey 2, is to overcompensate. That's as I pointed out in my reply brief. It seems to me the government wants to frame the duopoly as either we don't compensate any of the victims or we overcompensate certain people. In this case, Judge Stewart, there's no doubt many of the listed victims, as Judge Solis said himself at the sentencing, are in fact not the ones who qualify as victims. I know my time is up. If I could just direct the Court to Record 1175, or at least Tisdale's 1175. Mr. Brodin, and then 612, Anita, one list, Bank of New York is the victim, and the pre-sentence report has American Wholesale as the victim. And the Court's response, we will track down the victim. In other words, the judgment, as written, the restitution part, which is directly quoted in Mr. Tisdale's brief, awards restitution which, one, is probably invalid to people, legal entities, at least, which are not, or were not, victimized. That is impermissible from every aspect of restitution doctrine. All right. Thank you. I appreciate it. You've reserved a rebuttal. All right. Mr. Whalen. May it please the Court. Good morning. My name is James Whalen. I represent Lindell Beecham. The two issues that I'd like to discuss today relate to the sufficiency of the evidence as to his convictions of Count 1 and Count 2. In Count 1, he was charged with conspiracy to commit wire fraud, and we believe that the evidence clearly fell short of sufficient evidence to find him guilty of that offense. And I'd like to focus on, basically, the concept in U.S. v. Loney where it talks about specific intent, that there has to be specific intent to commit wire fraud, and that the person must intend some specific harm from his deceit. Now, the government's theory at trial was simply that Mr. Beecham was participating in these what we call VORs, or Verifications of Rent. The evidence clearly showed from trial, according to Mr. Frazier, that Mr. Beecham never created these documents or signed these documents. And so, without having any documents with his signature on or a handwriting, then the government moved to the next theory is that he was aware that he was participating in this conspiracy. And so, that solely relied on the testimony of Mr. Lockhart and Mr. Frazier, and we believe that the testimony of Mr. Frazier and Mr. Lockhart clearly fell short to establish that. Why they did what departure from the usual, what departure from the usual notions of attribution and conspiracy law are you urging? That he wasn't part of the conspiracy that, I mean, I know you're saying not where, but sort of homebook. He's charged in the conspiracy. He's charged with the knowledge of others, etc. So, specifically, where do you say the chink was in the, I mean, assuming the believability of the witnesses having him looped in, why isn't he culpable that way? Well, I think if, I would agree that if there's a believability of Frazier and Lockhart, then... Our case law clearly forecloses that, I mean, doesn't it? I mean, they testified to certain facts. They did testify to certain facts, but I think their misstatements that they made compared to other people that testified, especially when it related to Jermaine Frazier... It all comes down to credibility, doesn't it? I understand that, but I think that they're, our position is that they're not reliable, that they couldn't be relied on to establish that. If you have a case from our circuit or any place else that says, as a matter of law, we said this testimony is not reliable. It has to, the stand has to be credible and unbelievable to disregard a co-conspirator's testimony, and I agree that the case law clearly says that they can rely on a co-conspirator's testimony. Our belief, based on the record as a whole, that it was unbelievable because there were so many contradictions between not only Mr. Lockhart and Mr. Frazier, but also Mr. Frazier as related to the straw buyers. Mr. Frazier testified on several occasions. Every single one of those people came in and sat down across from him and filled out those documents, and then every other, every straw buyer that I recall from the record came in and said, I never sat down with Mr. Frazier. I never filled out the documents. I gave him some information, and he created them whole cloth from there, and so I think those contradictions are important. That doesn't have anything to do with the VORs. I mean, the fact that he didn't sit down with the straw buyers lends credibility to the theory that Well, I don't, I disagree. I don't think it does, but I think the other part that it goes, as far as the conspiracy goes, I think that's important that as far as whether Mr. Beecham was involved in the conspiracies, I think the testimony of Frazier and Lockhart, where they both said that they began, one Frazier said, I didn't believe I was, you know, we started this with good intentions, I think was the quote of Mr. Lockhart and then Mr. Frazier, and so the Mr. Beecham agreeing to participate in an agreement to violate the law. Where was the agreement to violate the law on Mr. Frazier and Mr. Lockhart? Because they both said, Mr. Lockhart testified, I started this with good intentions, Mr. Frazier testified. Well, I thought there was evidence he knew that they were, each of the straw purchasers was getting $15,000 or $20,000 out of the deal, and that, I mean, I thought there was evidence from which someone could figure out that this is not a I think when it relates to the count one with Mr. Beecham, I think solely with the VORs, the argument is, is that they believe that they were, this was a legitimate deal and it was started with good intentions, that therefore he can't then agree to enter into a conspiracy where there's no agreement to violate the law or knowingly with the specific intent to defraud. So I think that kind of goes to that part of it. I said, and then the second part, I think, as it relates to count one is the materiality of these VORs. I think there is, obviously, there is testimony in the record that they say, well, we would look at these VORs, but I think the evidence is contrary to that. Because when you look at the specific, all the different documents, the verifications of rent that were submitted in the evidence, there's so many of them that don't have any information in them. They don't have addresses, they don't have phone numbers, they don't have any identifying information in them. And then there was testimony that, at least on one of the exhibits, Veronica Gilby, I think, was the witness that said, well, there's no way we would have relied on that because it doesn't have any information in it. That's one out of... That was one of them. But I think also when we talk about that, they said, well, there's no way we could have relied on it. I think it goes to the greater inference of the evidence that they didn't rely on them at all. Because when you look at every underwriter testify that we, or mortgage person said, we just verified income and employment over and over and over again. And so they never said we came back and verified these verifications of rent. They said, well, we may have relied on them, but I think when you look at the documents as a whole and the way they were put together and the way they were presented, I don't think the evidence supports that there was any reliance on them in a material way based on the testimony that said we just verified income and employment for these types of loans. So I don't think... I think the evidence falls short on the materiality part of it as well. And so on the count one part for Mr. Beecham, I don't think the evidence was sufficient for those reasons. Also with regards to count three, which was the substantive wire fraud, once again, I come back to the specific intent to the fraud. I know that he had a general warranty deed. Now, I know the but there was no specific intent to the fraud because there were so many different third parties involved in this. There was realtors. There was title agents. There was everybody that was aware that was going on because if you look at the title policy, it showed in the title policy that this was subject to an unrecorded warranty deed. And so it was there and disclosed in the title policy. Secondly, WMC, there's testimony that they did a collateral review because there's an appraisal was inflated and that was part of the fraud. But it shows they did a collateral review. And they also requested a 12-month chain of title. So in their underwriting policy, it reflects that they did a collateral review. They did a 12-month chain of title. The title policy says there's an unrecorded warranty deed. So to me, based on the evidence, it appears there's full disclosure of this. But finally, I get to the end when you talk about specific intent to the fraud. When you look at Mr. Beecham's statement to the regulators and the auditors that he goes, I believe these transactions to be legal at the time. He believed that they were legal and he could do it this way. And I think the documents reflect that because they were fully disclosed in the title policy and everything else that they did. And so when you get down to specific intent, did he intend to harm anybody? Well, it didn't harm the fact that they were taking the mortgage proceeds and paying off the straw buyers and then scraping some off the top for themselves. It wasn't the fact that he didn't—he hadn't paid the price for the properties. It was they were taking mortgage money and using it for other than paying the purchase price of the property. They were— I think that would make—I would agree with you if there was the inflated appraisal. But I think when you look at— I thought there was evidence that there were. Well, I think there evidence that also that there wasn't because I think there was testimony in the record that the appraisal of the property through the central appraisal district at the time was on par for the sales price. And so there was some testimony or some evidence to support that it wasn't inflated. And also I think— But there was evidence that it was. I mean, we've got to take the evidence in light most favorable to the jury verdict. Right. And I think also going back to it, you had the testimony of Mr. Moorman who said, no, I inflated the appraisal that Collin County appraisal district evidence suggested otherwise. The fact was that the price that Mr. Beecham agreed to pay to the sellers was quite a bit lower than the mortgage that they obtained. So there was a pretty good spread in there. Yes, there was a good spread. But I think based on the evidence that it was an arm's-length transaction, there wasn't anything inflated that if—based on the fact that the loan company did a collateral review and were satisfied that the collateral was sufficient to support the loan. And so I think, you know, market forces, you know, one could say, we bought it at this price. He was able to sell it higher due to maybe changes in the market. I don't necessarily think that in and of itself would show that there was intent to harm. I think the other interesting part about the Quinlan property was that eventually that was any harm to anybody. You have to look at the time. But I think when you look at the transaction as a whole, I don't think there was any intent to harm the mortgage company or anyone else other than the fact people made a transaction that they were able to profit from. Well, I thought there was testimony that they knew these people couldn't pay the mortgages. They agreed to pay the first two payments. They knew they were going to default. They didn't care. So it was fairly likely that the mortgage company was going to end up holding the bag. For the most part, that was the general theme of it. But I think when it came to Mr. Mizzou, I don't think there was testimony that he said, no, there's no way I could have made it. He did eventually, he did make payments on it, eventually sold the property and was never in default on it and never went into foreclosure. So I think when it comes specifically to the Quinlan property, I don't necessarily believe that applies, Your Honor. Thank you. All right. Thank you, Mr. Whale. Mr. Perez. May it please the Court. I initially want to request that the Court allow us to adopt the arguments put forth by Co-Counsel Tisdale under Rule 28I regarding restitution. There was some brief discussion in my brief regarding that, mainly about that defendants' order to pay restitution amount greater than lost cause and the error affects substantial rights. But I want to talk to you more about the multi-conspiracy issue. We discussed the multi-conspiracy issue under Maribel, and I believe those factors still pertain on here. They were in the context of double jeopardy, but they still pertain. I do want to argue this and discuss this regarding the three factors under Morrow, though. As a background, Morrow was a conspiracy involving persons who fraud in mobile homes, and everyone in that conspiracy were all part of the same conspiracy. They were just a division of labor. Under Mitchell, that the government also relies on, it was a drug conspiracy, and what you see is a hierarchy involvement there. So the Court does not believe there's multiple conspiracies. In our case, it's different. We have a dissolution between the partners. Now, the first one is common goal, and the government is right. It is broadly defined, but this is a little bit different. They indicate that in Morrow, the common goal was for the mobile homes. They're saying that's the same with us, but what they see in that definition is the goal is to derive gains. It's not to do the mortgage fraud or commit this fraud against lenders. It was to derive gain. In ours, it was to derive gain. That's not a common goal, because the gain in our situation was for our conspiracy. The gain in Lockhart's was for their conspiracy. That was not the common goal. The second factor is the nature of the scheme, and it's inferred from the activity. Basically, the activity is the one scheme, a necessary or admonition success of another. That's not true here. We have separate entities by name, by employees, by the method of which they may have committed this fraud. The government says that there's a larger plan, and it spans both conspiracies, but that's not true. They say that's because of holidays, and Jacqueline Hawthorne was involved, and the parties knew both of them, but there was not an agreement to defraud the holidays in our case. There was no specific intent to defraud them before the split, and there is no evidence of that. Also, regarding any kind of early groundwork made late on this, the government says that there was this football given to Catherine Gill. There were talks between Lockhart and Tisdall after the split. I don't think the football is enough to tie these two conspiracies together. I don't think the conversations were after the split, but after the conversation, Tisdall said he just wants to know my business plan, and I'm not going to give it to him. Also, the difference in the nature of the scheme was we didn't use the false VORs, didn't use the false appraisals, and every one of the properties that Jones was involved in, the lenders agreed that the appraisals were fair appraisals because of the comparative values of the homes around him. What we have here, there's a disparity in what's been earned, what was made here, and how the houses were sold for, but what we have is that everybody that bought a home got what they paid for and what they bargained for. The fact that Jones made a profit on that doesn't mean that he had an intent to defraud. The last factor are the overlapping participants regarding the interrelationships between the parties. In this situation, Lockhart was a key player in his conspiracy. Tisdall was a key player in his conspiracy. There was a dissolution. They drew up papers. There was a pardon of the ways. Lockhart took his clients. Tisdall took his clients. There was no sharing of profits. It was a situation where Tisdall opened up a branch office. No, it was a complete name, completely different. There was no connection between them. I guess lastly, what I want to talk about is the harm analysis. I do believe that in Berger it says that the conspiracies, if a defendant is found guilty of one of the conspiracies, substantial rights aren't affected, but they are affected if the defendant can show prejudice by variance in what was charged and what was proven. As the government says, this is regarding to a transference of guilt from one co-defendant to the other and saying that there's not. There is. They found our clients, Tisdall, Jones, and under Pinnacle and Attila, guilty by association. The government says there's no spillover prejudice, but that's exactly what it was. In addition to that, I think that the serious—the problem that we had in our case, the real harm was, is that the jury wasn't able to make a reliable judgment about guilt or innocence on our conspiracy and that it did affect my client's trial rights. All right. I gave you an extra minute. You may not have known that. About a minute. About two seconds. You had run out a long time ago. I gave you an extra minute so you could get that last point in. All right. Thank you, sir. All right. You're from the government. Some slight disagreement? Just some of the points, Your Honor. Leah Simonton for the government. I'm going to start with restitution. I think that is the issue that's really at play here, as shown by the fact that's really the only issue that was addressed in the reply briefs and that's what they started out with. The government realizes it's in a compromised position on this because of the Fraser opinion. The government realizes that. But the government also sees no way to concede error. So I'm not going to do that. I still believe that Judge Solis did a reasonable thing by looking at the evidence in the record, looking at the agent's testimony where she explained that she was not able to produce the documents of what the secondary lien holders paid for the loans, looked at the time period of the loans. One thing I want to address is that Mr. Tisdale's counsel suggests that these loans could have been sold 100 times. If you look at Sentencing Exhibit 1, which is Tisdale's properties, those loans were foreclosed on in between one and three years of when the loans were taken out. There was not time for them to be sold 100 times. There was barely time for them to be sold once. I believe there's some of these loan companies, or it may have been the trial, but some of these companies are just mortgage companies. They're not loan servicing companies. So what would happen in some of these cases was that the loan company would issue the loan and it would sell it to a servicing company. The servicing company would end up foreclosing. The other thing that happened in some of these situations was after the loan was given out, it was sold to an entity that sold it as mortgage-backed securities. So those were the two things that mortgage to change very much because of the short time frame we're talking about, B, not time for them to be sold several times. Looking at all of those facts, Judge Solis made the very reasonable determination that instead of awarding zero restitution, which is what the defendants were asking him to do, to victims who were obviously injured in some way, he would award restitution equal to the face amount of the loan minus the amount of the property once it was sold out of foreclosure to a third party. And that is what he did. And the government maintains that that was the correct way of calculating the restitution amount in this situation. Assuming it was—let's assume based on what was known at the time, you know, that was the best approach or whatever. I mean, does the government acknowledge that—well, let's back up to the point made by the other side, that the government didn't produce the best evidence, you know, that there was either the second best or not. I mean, what do you say to that? The government produced evidence that it had available given the state of the defunct mortgage companies and other holders of these properties at the time. Mr. Tisdale's counsel admitted that this was a crazy time in loan funding where a lot of companies lent money, and then because of the great number of defaults that happened during the recession, they are defunct. The documentation is just not there for some of them. But they still are victims. What do you do in that situation? And that's where the government asked Judge Solis to go ahead and award restitution, according to this formula that I explained, instead of awarding zero. Now, in terms of Mr. Tisdale's argument that we should not get a second bite at the apple because we could not produce the documentation the first time, there are other ways. First of all, Frazier, if it's adopted by this Court—Frazier's unpublished, obviously, so I would say technically it doesn't exactly change the law in the circuit, although a lot of district courts are going to follow that anyway—but certainly, if this Court were to issue a published opinion adopting Frazier's reasoning, which we asked the Court not to do, but if you were to do that, then that would change the law in this circuit on how to determine restitution in these circumstances. There was no case telling Judge Solis what to do and telling the government what type of evidence to produce. Although the government may not be able to produce, as it said the first time in the first restitution hearing, it may not be able to produce any documentation showing what the secondary lien holders paid to purchase these loans. It could potentially provide expert testimony or something else to say that in these precise circumstances, the secondary lien holders would not have bought the loan for less than the face value. I can anticipate that that is what we would try to do, for example, at Frazier's new restitution hearing that he will get, and that's another point I wanted to highlight, is that Mr. Frazier, who is a co-defendant of these defendants, will get a new restitution hearing, and so it would be unfair for the government to not also be . . . Suppose we take you at your invitation, and we here issue the opinion from this panel formally adopting Frazier, not Frazier, the defendant, but adopting the unpublished, non-precedential analysis, if you will, holding of that case, and remand for further proceedings in light of A, Frazier, and B, to the extent robbers or rubbers applies, and just sort of clearing the slate, so to speak, so that without necessarily criticizing whether what Judge Solis did was what the law is, but particularly, as I was trying to say before, this kind of evidence is just kind of nebulous. I'm not sure whether the snapshot the government had back then of these defunct mortgages . . . I have trouble staying with what the quality of that evidence will be on a remand or not, but as pointed out, that's the government's burden. So, I guess, underneath my question, is there some potential quality of this evidence or availability of evidence, etc., that may be available to then be applied to the new legal principles? Yes, Your Honor. One thing I think that we're also going to explore is whether we could get representatives from the defunct mortgage companies to say what their practice was and in terms of the lien holders who ultimately sold the properties after foreclosure, they could testify to what their practice was in terms of what the amount they usually paid for mortgages from the original mortgager, the original mortgage company would be. So, there is potential testimony that I can imagine that we would try to elicit at a restitution hearing that would, we expect, be a good substitute for the documentation that we can't get. So, the government strongly requests that we be allowed another chance to make these victims whole, as you said, Judge Stewart, because we're not just talking about us, we're talking about the victims. The government has an obligation under the law to try and make these victims whole, and we will . . . If the victims are defunct, where does the money go? The secondary purchasers? It goes to . . . I'm not sure. It would go to the receivership if they're in bankruptcy. It would go to the receivership and be distributed in line with what the court orders relating to that would be. So, it ultimately would go to whoever is standing in the place of those companies at this point to be distributed as they see fit. Potentially, just in a ballpark figure, how much are we talking about? Well, I did some rough calculations of how much would be an example, and for example, Mr. Tisdale's case, and we're looking at possibly half of his restitution amount that we're talking about. And his restitution amount is a little over a million dollars. It's $1.1 million. I believe we're looking at about $550,000 that victims might lose if we don't allow a new restitution hearing. If this court does decide to adopt Frazier, which, as I said before, the government's position is that you shouldn't do that, but we understand that you might. I wasn't suggesting that Judge Owen or the panel decided to do that. I was just trying to give you a hypothetical if it came to that, but I wasn't suggesting that we made any such decision beforehand to necessarily do that. There are probably some reasons not to do it, but just so everybody's thoughts are kind of out on the table. And, of course, I've seen that happen before. So, A, obviously, completely up to this court what to do. Obviously, though, this court can also, although it might present some practical difficulties for you, reach a decision contrary to Frazier. Now, and I want to move to Mr. Beecham's arguments. Judge Owen, you were correct that the evidence just simply goes against Beecham's arguments on both of his counts of conviction. I'll start with Count 1. He argues he had no specific intent to defraud the lenders. In line with that, he suggests he didn't create or sign any of these documents, and that's just purely contrary to the record. Mr. Frazier testified that he first contacted Beecham when he could not get a loan through because he could not show that this straw buyer could afford the loan. And I have the testimony on page 29 of my brief. So Frazier says he talked to Mr. Beecham about this because he thought maybe Beecham could help him with this. And he told Mr. Beecham, I need you to sign a false verification of rent document so I can get this loan approved. And he said Beecham had some questions about it, so they talked about it. Frazier actually sent him the form for the verification of rent. Beecham read the form and sent the document back to him the way Frazier needed it. And so then the prosecutor asked even more clearly, did he sign it? Frazier says, yes, he did. Did he sign it with false information in it? Yes, he did. Had you told him the information was untrue? Yes, I had. So this was not something that Frazier and Lockhart just concocted, or Tisdale too, just concocted a scheme where they were just using Mr. Beecham's name. But actively participating in it. And he was being compensated for that. He got, I believe the testimony was about $200 per verification of rent that was filed with the loan application for each letter that was filed. The testimony is also that Frazier had permission to sign some of these verifications of rent when Mr. Beecham was not available. That comes from Yes, the testimony is that he was paid for all of them that were filed. And Lockhart said whenever, he agreed that whenever Frazier signed those, Beecham knew what was going on. Beecham gave his consent authorization for Frazier to sign Beecham's name. There were about, I believe the testimony was about eight properties in which these were filed. Those include the ones where Frazier signed. And the loss was almost a million dollars from those properties. In terms of the materiality of the verifications of rent, the government also highlights that testimony in its brief between pages 28 and 35. But just to briefly summarize, Frazier explained that the reason in the first place he asked, and I just repeated this to the person in front, was he was having trouble getting a loan through. That VOR after Beecham signed it and Frazier submitted it helped get that loan through. Lockhart also testified it was important to have a VOR because lenders sometimes required it. And then Veronica Gilby testified that VORs are material to an underwriter's decision to recommend approval of a loan because they show that the person applying for the loan has shouldered a payment that is in line with the mortgage payment that they are applying to get. Mr. Beecham talks about one VOR where there was some information missing. It was really irrelevant, basically irrelevant information. I think it was his address that was missing. And then there was a box. The wrong box was checked. It said the box for verification of mortgage was checked instead of verification of rent. But if you look at that exhibit, and that exhibit is discussed in my brief, the relevant information showed it was clearly a verification of rent. It explained how much rent the straw purchaser was supposed to have been paying per month and for how long they had held the lease. So that, too, would have the correct information for a mortgage company to rely on in lending. On count three, Mr. Beecham also is ignoring the evidence when he argues that there's no evidence of specific intent. I want to just say that this count three, and it focuses on a specific transaction called the Quinlan transaction for the house that it pertained to, it was about more than whether Mr. Beecham owned the house when he, as a middleman, sold it to the end purchaser. Because what happened was this couple called the Beatles. They owned the house. They sold it to Mr. Beecham for $310,000. A few months later, Mr. Beecham sold it to Mr. Mazoo. Actually, it was at the same time. I'm sorry. They were basically simultaneous transactions. But then he sold it to Mr. Mazoo for $400,000. So that's a 90% markup in a span of weeks. And it's more than did he have the title when he sold it to Mr. Mazoo from the Beatles. It's the fact that he also acted as the broker for the transaction from himself to Mr. Mazoo. And he misrepresented several things in the loan application that funded the purchase of Mr. Mazoo's home, including Mr. Mazoo's income. He misrepresented several things. I believe increased it by about $5,000 per month. It was a false verification that Mr. Mazoo would occupy the property after the purchase. The loan document said Mr. Mazoo would. And this was a common theme throughout all these transactions, these false verifications of occupancy. Mr. Mazoo was not going to occupy the property. Then there was also the fact that Mr. Beauchamp hid from the mortgage company that he was acting both as the broker on the transaction and the seller of the home. So this was far from an arm's length transaction. This was a very close transaction where there was an obvious conflict of interest. Not only did Mr. Beauchamp not mention the fact that he was the broker and the seller to the mortgage company, but he actually altered documents or created two sets of documents to prevent the mortgage company from finding out that he had been both the broker and the seller. And it was one of the loan inspectors for the company that lent the mortgage that testified of this. Her name is Diana Taylor. And this is in my brief at pages 48 to 52. But she explained that there was no reference to his company Ace Mortgage in the documents that the mortgage company had, even though there was in another set of documents that was retained by Ace Mortgage. Another thing that Mr. Beauchamp claims is that the property value when it was sold to Mr. Mazoo was not inflated, and that's just a lie. Brian Moorman was an appraiser, and he testified that he was paid to inflate the appraisal that led to Mr. Mazoo's purchase of that house. And that's pretty obvious when we look at a first sale price of $310,000 and a second sale price weeks later of $400,000. But Moorman testified, I did inflate it. And then we also had the real estate agent who represented Beauchamp in the initial transaction where Beauchamp bought it from the Beatles, saying it's crazy that Beauchamp turned around and sold that house for $400,000 when he just bought it for $310,000. She didn't think that that house could appreciate that much in that short of a time frame. Finally I want to move to Mr. Jones's arguments. He focused on the multiple conspiracy argument. First of all, as I explained in my brief, beginning on page 36, whether a count charges multiple or single conspiracies, and whether the government has proved multiple single conspiracies, is a question of fact for the jury, with a very deferential standard of review. It's the same type of standard of review we have in sufficiency cases, where the defense can only overturn that finding if they can show that the evidence viewed in the light most favorable to the government would preclude a reasonable juror from finding a single conspiracy. Here, the evidence is not that clear at all. In fact, it very much supports there was a single conspiracy. Before I even get to the evidence, though, I want to mention that at the defendant's request, the district court gave the multiple conspiracy instruction, so that it charged the jury that if they were to find that any of the defendants were not a part of the conspiracy charged in Count 1, they were to acquit. If they were to find that one of the defendants was part of a different conspiracy than the one charged in Count 1, they were to acquit. Obviously, the jury did not believe that there were different conspiracies, obviously, than the one charged in Count 1. The defendants also strongly urged their argument to the jury in closing arguments. I believe every defense attorney did. I know for sure Tisdale and Jones's attorneys argued exactly what they're arguing here, that there were multiple conspiracies and not a single conspiracy, and therefore their clients could not be convicted. The jury rejected that argument. The government has highlighted, according to the Morrow factors, the evidence that supports all three of the factors. The existence of a common goal, which Mr. Jones's counsel ignored, is to be broadly construed. It is not limited to—the common goal is not limited to, are they always engaging in things that every conspirator will profit from? Clearly, that would not be the case in most conspiracies, because most conspiracies are not these tightly wound circles. They are amorphous. They're more like amoebas, and they change over time. But there were common defendants in the beginning of the conspiracy, and there were even common defendants at the end, even when Tisdale and Lockhart weren't technically doing business together anymore. There were conspirators like Suarez, who was doing business with both of them, both of the branches of the conspiracy. There were also several straw purchasers who had interaction with many of the conspirators during the time frame when Lockhart and Tisdale were beginning to separate. A few of those include Jacqueline Hawthorne. She was our witness number seven. And Catherine Gill—actually, Catherine Gill was interesting because she first had interaction after the split, but Tisdale and Jones still told her Lockhart was the head of their company, and that that's where she got the football. But it wasn't just the signed football from Lockhart. It was the fact that they were representing to her that Lockhart was still involved in the company when she was engaging in these transactions with them. Even if—one more is William Purcell. He bought three houses. The first he bought with Lockhart, Tisdale, and Jones. The next two he bought with Jones and Tisdale. So there was not a clean break. There were a lot of straw purchasers that these defendants had in common. Some of them began with one or two of the defendants pitching the deal to these investors, and then, in the end, after Lockhart and Tisdale separated, Lockhart and Frazier would take some of these. Tisdale and Jones would take others. They would execute the same scheme. Let me ask you, Mr. Kritzker directed our attention to record page 1175 and said many of the listed victims are not the real victims. What's he referring to? He's referring to the fact—not the fact, but there was testimony in terms of—at the restitution hearing, that's what he's talking about. The restitution hearing, there was a lot of discussion of representatives for the victims. There were trustees. As I explained to Judge Owen before, there are trustees for some of the victims because they're defunct. In the spreadsheet that the agent provided, some of the names of the trustee—it would be the trustee, and then on behalf of, and then the actual victim name. On one of those, she had the actual victim name cut off, so you couldn't tell what the name of the victim was. I think there was only one instance of that. There was another discussion of, as well, and actually American Wholesale Lenders is a sub of Countrywide, so that's not really a discrepancy, and that's in the record. He was talking about what are the names of the real victims versus the representatives of the victims. And what I did in my victim list in our brief, and I counted 10 victims who had at least some amount of loss, and those were the ones who ended up selling the properties in foreclosure, and those don't include any of the victims that were disputed in the restitution hearing in terms of what was the name of the real victim. So I excluded those, the one where the victim's name was cut off, and I still came up with 10. So the government sees no issue there. That's on pages 54 to 56, and I want to correct where we're on that topic, Judge Stewart. Mr. Tisdale represents that the case agent's testimony, that I'm not giving the proper citation in the brief to the case agent's testimony where the case agent is discussing exactly what I said, that some victims are named by trustee, and then on behalf of, and then the victim name. And I checked again, and I do give the correct record site. It's page 10, 19 through 20 of the restitution hearing. Do you have a response to his urging of us to read Singletary from the Eleventh Circuit in which he argues that the remand occurred without giving the government the second bite of the apple? Do you have a response to that case or want to comment at all? I do not know that case because he has not filed a 28-J letter on it, so I have not had a chance to look at it. I will look at it later today, but I am familiar with a similar case in this circuit, and that was Chemical and Metal Industries. That was a case where the government simply did not fulfill its obligation at all to produce any evidence supporting restitution. It was just a big flub. And in that case, I think to penalize the government, the Fifth Circuit said, we're not going to allow you to have a second bite of the apple to prove restitution. That was a completely different situation than here when we had a very long, a 200-page, two-day restitution hearing where we tried, and we were talking some about the documents that the agent could not provide. What we haven't talked about is all of the information and the spreadsheets that the case agent did provide. She went into painstaking detail about all of these properties. She looked at so many records. You can see that just by all of the exhibits that were entered at the sentencing. The government did try very, very hard to fulfill its obligation here, and we should not be penalized in the way that the government was penalized in Chemical and Metal Industries. If the court has no further questions, the government will see the remainder of its time. The government asked that the court affirm on all grounds, and if the court does decide to remand for a new restitution hearing, it asks that the court allow the government to try and fulfill whatever its new obligations might be under this case, under this new opinion, to provide restitution to these victims. Thank you. All right. Mr. Quince, you have a right of rebuttal. Yes, Your Honor. I don't dispute the case agent put a lot of time and effort into creating this exhibit right here. The problem is that most of the information on there is wrong. In the Supreme Court, when they reversed earlier this year in Henry Amy Paroline, they said the danger of restitution is that it is a criminal penalty with no beyond reasonable doubt protection and a civil remedy with no Seventh Amendment jury trial right. That is why restitution is so important here, Your Honor. One of the first parts of Ms. Simonson's argument, she said, well, there wasn't enough time here probably for these loans to be resold a hundred times. Well, maybe there wasn't enough time for them to be resold a hundred times, but I assure you that throughout—I think in our reply brief we cited the quote from the Financial Crisis Inquiry Commission. The core function of mortgage originators throughout the industry at that point in time, almost ten years ago now, sometimes they didn't even hold a new debt obligation for a single payment. They immediately turned around and resold it to one of the larger banks. The Financial Crisis Inquiry Commission described these mortgage originators as mere sales offices for Franny and FedEx. Not legally. They were different legal entities, but that was what their function was. I don't know how quickly that they were sold before a single payment was received in this case. I do know the government had to abandon that part of their multi-object conspiracy in Count 1 because they conceded there were no FDIC-insured originators in Count 1. They were necessarily these originate-to-distribute type entities. It's for that reason, Your Honor, that we don't know who the proper victims are. To take one example, I would refer the Court also to page 1124 of the record. That is from the first hearing before the judge reconvened for exclusively sentencing, and Mr. Brodin, Mr. Tisdale's trial counsel, started explaining about MERS, which is a recording company. There's been a lot of litigation about MERS, the Mortgage Electronic Registration System. It's this company in Virginia with like ten people and computers. What MERS has done is become a nationwide foreclosure plaintiff. What they did with these supercomputers is these securities were bundled up and tranched, and we know how this ultimately ended. What they did was enable to cut out the middleman. So they're able to remit to the ultimate investor. They cut out Goldman Sachs to go to the pension fund because it's ultimately paid to in these gigantic debt obligations. That's what they do. And yet, Your Honor, this company, which no one thinks that this computer data compilation company is a victim, they are listed in the name of payee in the judge's order as being owed $18,000. Now, there's no way that anyone just claims that MERS is a victim, and there's no way to know that MERS is going to ultimately remit that money to the person who we claim is a victim. Judge Owen asked, what do we do if the victim is a company that is defunct? They're no longer in business. I think the prosecutor's answer was, well, we'll look at the receivership order in bankruptcy court. Judge Owen, that does not fulfill the core function of restitution, which is to make the victims whole but not overcompensated and only victims whole. That is the core problem with what happened here. In my initial argument, Judge Stewart asked me, you know, why should we not allow additional evidence to be taken or at least allow additional victims to be located? I mentioned the Supreme Court's opinion in Dolan. I've done some further research on this since I sat down. We would commend to the court Professor Goodwin's restitution treatise, which we cited extensively in all of our previous briefings, Section 9.22. This is a section where Professor Goodwin specifically analyzes the issue in Dolan. Of course, in Dolan, what happened here is the statute says you have 90 days, and judges said, well, we'll go longer than 90 days, so the statute says 90. What do we do? It was a very contentious 5-4 decision. But what the Supreme Court specifically said in Dolan, and what Professor Goodwin cites numerous other courts of appeals have done, they said if a district judge says I'm going to hold open restitution for some additional period of time, then they can do that. Here there's no doubt that Judge Solis did not say, well, okay, I'm going to enter this order provisionally and then we'll find who the right victims are, the right people, and I'll amend the order, and then, of course, we could appeal to this court based on that amended order. That's not what happened here. It was a second hearing on restitution. The judge said the defendants didn't bring the countervailing evidence, so even though the government's evidence isn't really right, I'm going to go ahead and credit it. He signed the final order, that is the concrete restitution judgment. Any person who thinks they've been agreed by Mr. Tisdale could go in the public records and search, and that's what they would see, and that information is categorically wrong. That's why we submit and we go back down. If the government wants to find some additional evidence about damages, maybe that's okay. I'm not urging the court to do it. They should be confined to the four corners of the record. What the government should not be allowed to do is to go and find additional people who can now claim they are victims years after the fact when none of that evidence was adduced fairly in the first instance. I see my time is rapidly diminishing, but I would just point out, you know, the prosecutor makes this argument in her brief and in her response to my 28J letter that mortgages always increase in value. I'm pretty sure that's not what happened in this country in 2008 and 2009. The problem was not rapidly increasing mortgage prices. If these properties have fallen further in value by subsequent holders, maybe even financed by additional entities, that is too far removed from any causal chain attributable to Tisdale, and that is exactly what Justice Sotomayor said in her concurrence in the robber's opinion. Sounds like a great argument for Judge Solis, Mr. Stratz. He might invoke the complicatedness exception. That was a wonderful way for him to end the entire process, but I was not there for the original, but I will be there for the new. Got you in the books. All right. That segues to me, Mr. Kresge, Mr. Whalen, Mr. Perez, our system absolutely could not function without the excellent point counsel such as yourselves, not just in this case but in all the cases we have. This is a very complicated case in some measures. In some parts of it, not so, but in other parts of it, it's a little tricky. We appreciate as a panel and as a court all of you who serve as court appointed counsel in this case and others for the great work you do on behalf of your clients, on behalf of our system, and we thank you. Thank both sides for good arguments and briefs in the case. It will be submitted and we'll figure it out in due course. All right.